UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DERRICK INGRAM,

                   Plaintiff,

     -against-

CITY OF NEW YORK, DESIRAE LAFURNO,
ROBERT TOWNSEND, PETER ELLISON,
GUSTAVO PAUL, ANDREW SMITH,
MICHAEL CAFERO; and NYPD Members of
the Service JOHN and JANE DOES #1–60,

               Defendants.

No.  21 Civ. 9050

**COMPLAINT AND JURY
DEMAND**

Plaintiff Derrick Ingram, by and through his attorneys Kaufman Lieb Lebowitz &
Frick, alleges as follows:

### INTRODUCTION

1.     In the early morning of August 7, 2020, Plaintiff Derrick Ingram was
startled awake by the NYPD banging aggressively at his door.

2.     Because there was no warrant for Mr. Ingram's arrest, he exercised his
legal right to decline law enforcement entry to his home.

3.     But instead of simply leaving, the NYPD spent the next six hours executing
a terrifying, military-style siege of Mr. Ingram's Hell's Kitchen apartment.

4.     Mr. Ingram watched and listened in horror as the NYPD deployed snipers,
drones, helicopters, police dogs, and dozens of police officers, many of whom were
wearing tactical gear, to his apartment building throughout the day.

5.      Mr. Ingram, who had spent the summer marching in response to police brutality and systemic racial violence, was petrified that if he opened his door, he would be the next victim in a long line of Black people killed by police officers.

6.      In the late afternoon—after throngs of protestors and supporters gathered on Mr. Ingram's block in solidarity—the NYPD finally called off its siege, packed up, and left.

7.      The NYPD's choice to pursue Mr. Ingram with an arsenal of military-grade equipment, despite having no warrant for his arrest, was no coincidence or mistake.

8.      Mr. Ingram had emerged in the spring of 2020 as a leader in the Black Lives Matter protest movement through his co-founding of Warriors in the Garden, a youth-led activist collective that promotes peaceful protests against police brutality and advocates for an end to systemic racism, particularly against Black Americans.

9.      He was also the victim of a fabricated report by a police officer that falsely accused him of committing assault while at a Black Lives Matter protest.

10.     Given his public-facing role as an activist against police violence, Mr. Ingram was the perfect target for a conspicuous show of force by the NYPD.

11.     As a result of exercising his First Amendment rights, Mr. Ingram became the target of a warrantless full-scale attack on his home by the NYPD.

12.     The NYPD's ruthless tactics were deliberately designed to silence Mr. Ingram and to send an intimidating signal about what happens to people who denounce police brutality and supported the principle that Black lives matter.

13.     This barbaric show of force was an affront to democratic values and a violation of the U.S. Constitution.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT TO SUIT**

14.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a).

15.     Venue lies in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Manhattan.

16.     On November 11, 2020, Plaintiff served a notice of claim pursuant to General Municipal Law § 50-e upon Defendant City of New York through the Office of the Comptroller's online system. Pursuant to Executive Order 202.8, Plaintiff's time to serve a notice of claim was tolled from the time his claims accrued through November 3, 2020.

17.     On or about November 23, 2020, Plaintiff received correspondence from the Office of the Comptroller acknowledging receipt of his claim.

18.     The City of New York has not made a demand for an examination of Plaintiff under General Municipal Law § 50-h.

**PARTIES**

19.     Plaintiff Derrick Ingram is a 29-year-old man who resides in Manhattan.

20.     Defendant City of New York is a municipal corporation organized under the laws of New York with its principal place of business in Manhattan.

21.     At all relevant times, Defendant Desirae Lafurno was a police officer in the New York City Police Department ("NYPD"), Shield # 16959.

22.     At all relevant times, Defendant Robert Townsend was a detective in the NYPD, Shield # 26441.

23.     At all relevant times, Defendant Peter Ellison was a detective in the NYPD, Shield # 1101.

24.     At all relevant times, Defendant Gustavo Paul was a detective in the NYPD, Shield # 6186.

25.     At all relevant times, Defendant Andrew Smith was a detective in the NYPD, Shield # 1703.

26.     At all relevant times, Defendant Michael Cafero was a sergeant in the NYPD.

27.     Defendants John and Jane Does #1–60 are NYPD uniformed members of the service whose identities are unknown at this time.

28.     Defendants Lafurno, Townsend, Ellison, Smith, and John and Jane Does #1–60 are sued in their individual capacities.

## JURY DEMAND

29.     Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

### *Plaintiff Leads Nonviolent Protests Against Police Brutality Throughout New York City*

30.     Spurred in part by the murder of George Floyd by Minneapolis police officer Derek Chauvin on May 25, 2020, protesters in New York City and across the world took to the streets in the spring and summer of 2020 to demand an end to racial injustice.

31.     In New York City, protesters sought accountability from the NYPD for a long history of systemic police racism and brutality.

32.     Plaintiff Derrick Ingram was among the protesters who demonstrated in Manhattan, Brooklyn, and Queens on behalf of the Black Lives Matter movement.

33.     Through his participation in those demonstrations, Mr. Ingram joined a group of young people that together founded Warriors in the Garden, an activist collective dedicated to nonviolent protests propelling social and legislative change.

34.     Warriors in the Garden began organizing and leading protests on issues including police brutality, race-based discrimination, and other forms of systemic oppression in early June 2020.

35.     As the number of protesters speaking out against systemic racism grew, so too did the public following of Warriors in the Garden: Two months after its inception, the group had amassed an Instagram following of over 30,000 people.

36.     Mr. Ingram, who coordinated digital marketing and outreach on behalf of Warriors in the Garden, used technology and social media to publicize racial justice protests throughout the city.

37.     Mr. Ingram also frequently spoke out publicly at the demonstrations.

38.     At one protest, which took place on July 12, 2020, in Bayside, Queens, Mr. Ingram marched with Black Lives Matter protesters opposite a group of pro-police, "Back the Blue" counter-protestors.

39.     Mr. Ingram was spit on, kicked, and pushed by unidentified members of the counterprotest, resulting in scratches on his forearm.

40.     Although Mr. Ingram tried to inform the police officers on the scene that he had been assaulted by pro-police demonstrators, the officers ignored his complaints.

41.     Following the assault, Mr. Ingram went to the 111th Precinct to file a verbal complaint regarding the assault and the lack of response by the officers on the scene.

42.     No arrests were made, but the NYPD recorded Mr. Ingram's name and date of birth in connection with his report.

### The NYPD Executes a Warantless Military-Style Siege on Mr. Ingram at His Home

43.     On August 7, 2020, NYPD officers, including Defendant Andrew Smith and Defendant John/Jane Does #1–50, descended upon Mr. Ingram's home in an aggressive military-style raid that escalated in intensity throughout the day.

44.     At approximately 7:15 a.m. that day, Mr. Ingram was awoken by an NYPD officer banging on his door.

45.     As Mr. Ingram cracked open the door briefly, he saw Defendant Smith holding a rolled-up piece of paper.

46.     Mr. Ingram, who had no criminal history, was confused and disturbed by the presence of the NYPD outside his home.

47.     After closing the door, Mr. Ingram asked Defendant Smith whether he had a warrant and requested, if he did, that he slide it under the door.

48.     Defendant Smith falsely stated that he had a warrant. He did not. Instead, he slipped a business card under Mr. Ingram's door, which identified Defendant Smith as a member of the Manhattan Warrant Squad.

49.     Defendant Smith later admitted that he had no warrant, but stated that he wanted to talk to Mr. Ingram about the Bayside incident.

50.     Mr. Ingram exercised his legal right to decline consent to enter his home.

51.     Over the next hour, Mr. Ingram observed through his peephole as approximately 10 more officers arrived in the hallway outside his apartment.

52.     Defendant Smith and Defendant John/Jane Doe Officers #1–10 attempted to interrogate Mr. Ingram through his door, despite his repeated statements that he did not want to answer questions without counsel present.

53.     Frightened that the officers would shoot him or attempt to plant incriminating evidence if he opened his door, Mr. Ingram began livestreaming video footage of the incident on his Instagram account.

54.     Mr. Ingram also called an attorney for help.

55.     As he looked through his window, Mr. Ingram observed that several additional officers, Defendant John/Jane Does, were standing in the courtyard of his apartment building.

56.     Dozens more Defendant John/Jane Doe NYPD officers were arriving on the street outside his building, taking position around his apartment, and knocking on his neighbors' doors.

57.     Several NYPD officers arrived wearing tactical gear and carrying shields.

58.     Mr. Ingram anxiously watched officers carrying sniper rifles run across the rooftop of the building next to his and take positions in empty apartment units in that building.

59.     He grew more distressed as he observed a red beam of light that he feared to be a sniper rifle laser appear to take aim inside his home.

60.     Mr. Ingram desperately covered his windows with anything that he could find in his home, including a black sheet and a mattress.

61.     When he saw light coming in from one of the windows, he went to cover the window more fully. Upon drawing back one of the coverings, Mr. Ingram was

startled to see that he was face-to-face with an officer, who was standing on his fire escape.

62.     Two officers had climbed Mr. Ingram's fire escape to peer into his window.

63.     One of those officers, who was African American, attempted to coax Mr. Ingram into opening his door, saying: "I'm Black, you're Black, let me inside."

64.     That officer, apparently aware of Mr. Ingram's Instagram posts disclosing that Mr. Ingram's grandmother had recently died, asked, "What would your grandmother think?"

65.     An hour later, when the same officer appeared again and requested that Mr. Ingram let him in because he needed to use the restroom, Mr. Ingram responded, "Please don't let them kill me, I'm scared."

66.     Outside his door, one of the officers taunted, "You know we have equipment that we can use to come into your apartment, don't you know that?"

67.     As hours dragged on, the NYPD officers in Mr. Ingram's hallway used threats and intimidation tactics to try to trick Mr. Ingram into opening his door, telling him (falsely) that his legal counsel had arrived, and taunting him by stating: "Why don't you be the warrior you state you are and come out and face the system?"

68.     The officers' jeers were punctuated by the sound of an NYPD battering ram slamming against his door.

69.     The pounding from the battering ram caused artwork to fall from Mr. Ingram's walls and his television to tip over and break.

70.     Mr. Ingram also heard police dogs scratching at his door.

71.     He listened as NYPD helicopters circled overhead.

72.     He saw drones fly outside his window.

73.     On information and belief, the NYPD Defendants began to interfere with Mr. Ingram's electricity and cell phone service.

74.     As Mr. Ingram desperately tried to call anyone that he knew, he realized that his outgoing calls were being directed to the police department.

75.     The electricity in his home was intermittently going out, which caused a spotty WiFi connection and resulted in his livestream cutting in and out.

76.     He also began receiving text messages from police officers. At 11:45 a.m., Defendant Michael Cafero sent Mr. Ingram a text message, stating: "Hi Derrick I'm outside and would like to talk with you."

77.     Eventually, Mr. Ingram's phone stopped working, and he continued his livestream from other devices.

78.     Dozens of New Yorkers who had watched Mr. Ingram's livestream came to his street to voice support for him and to demand accountability and transparency from the NYPD.

79.     But the NYPD had blocked off the street and was preventing civilians from approaching Mr. Ingram's building, claiming that they were conducting an "active investigation."

80.     Finally, after nearly six hours of an unrelenting siege, the NYPD called off the operation and left.

81.     The officers left without making an arrest because they had not obtained a warrant and had no legal authority to enter Mr. Ingram's home.

82.     The operation was purely designed to threaten and intimidate Mr. Ingram.

83.    The NYPD chose to corner Mr. Ingram with such an egregious show of force because he is a well-known activist, and the NYPD did not like the content of his message or his complaints against the NYPD.

84.    Defendants sought to intimidate Mr. Ingram and his movement into silence.

### Behind the Scenes, NYPD Officers Scramble to Create a Justification for the Siege

85.    Unbeknownst to Mr. Ingram, the NYPD had been investigating him since mid-June 2020, using his social media accounts, facial recognition software, and surveillance videos taken from protests organized by Warriors in the Garden.

86.    The investigation was spurred by a false report by Defendant Desirae Lafurno that Mr. Ingram put a megaphone up to her ear and screamed into it while she was on duty at 47th Street and Broadway in Manhattan on June 14, 2020.

87.    One day after the July 12, 2020, Bayside protest at which Mr. Ingram was assaulted and subsequently filed a complaint, Defendant Lafurno provided Defendant Robert Townsend with Mr. Ingram's Instagram handle and identified him as the person responsible for the alleged June 14 incident.

88.    NYPD notes from the investigation show that Defendant Lafurno's boyfriend had found Mr. Ingram's photos by researching the hashtag #blacklivesmatter on Instagram and presenting Defendant Lafurno with photos he found of Black men protesting police brutality. Defendant Lafurno then chose Mr. Ingram, who was easily identifiable as a frequent speaker at Black Lives Matter protests, to blame for the alleged incident.

89.    Defendant Lafurno's report that Mr. Ingram shouted into her ear on June 14, 2020, was entirely false.

90.    Defendant Lafurno's description of the event and her injuries were similarly fabricated: although she reported to Defendant Townsend that she was treated by a doctor at the hospital for ear pain and irritation, medical records show that she had a completely normal ear exam, vestibular testing, and hearing test in the days following the alleged incident.

91.    On the day of the siege, Defendant Smith and Defendant John/Jane Does #1–50 harassed Mr. Ingram for nearly two hours before the NYPD even attempted to obtain a warrant for his arrest.

92.    It was not until mid-morning that officers on the ground, including Defendant Smith and John/Jane Does #1–50, plotted unsuccessfully with other law enforcement officers, including Defendant Peter Ellison, Defendant Gustavo Paul, and Defendants John/Jane Does #51-60 to try to obtain a warrant for Mr. Ingram's arrest— even though he had lawfully refused them entry hours earlier.

93.    Although Defendant Townsend had investigated Mr. Ingram by reviewing video surveillance and requesting a social media investigation in the months leading up to the raid, Defendant Ellison handled Mr. Ingram's case on the day of the raid, serving as an intermediary between the officers participating in the siege and an Assistant District Attorney while the NYPD scrambled to request a warrant.

94.    In response to the request, the Assistant District Attorney asked for additional information from Defendant Ellison, who rushed to gather details about Defendant Lafurno's fabricated report.

95.     During this time, Defendant Smith and John/Jane Doe Defendants #1–50 continued their campaign of intimidation, harassment, and manipulation of Mr. Ingram outside his home.

96.     Three hours into the siege, Defendants Paul and Ellison asked Defendant Lafurno to confirm that Mr. Ingram was the individual she was accusing in the alleged megaphone incident.

97.     Defendant Paul took still images from the Warriors in the Garden Instagram feed, which was sharing Mr. Ingram's livestream, and sent them to Defendant Lafurno, who then confirmed her fabricated report and false identification of Mr. Ingram.

98.     As the Assistant District Attorney continued to request more evidence from the investigators, Defendant Smith and John/Jane Doe Defendants #1–50 escalated the attack on Mr. Ingram's home in pursuit of their true objective: to publicly terrorize a well-known Black Lives Matter activist as a result of his exercise of his right to free speech.

99.     Defendant Cafero intimidated and pressured Mr. Ingram by messaging him directly more than four hours into the NYPD's warrantless and senseless persecution of him that day.

100.    On information and belief, Defendant Smith and John/Jane Doe Defendants #1–50, who carried out the military-style raid on Mr. Ingram's building, deactivated their body-worn cameras while doing so.

101.    The NYPD Patrol Guide requires uniformed members of the service to activate their body-worn cameras when, among other things, patrolling the interior of

any privately-owned building and responding to assignments concerning potential crimes.

102.    The disabling of body cameras was intended to prevent Mr. Ingram from identifying which NYPD personnel engaged in misconduct in executing the siege.

103.    The day following the siege, August 8, 2020, Mr. Ingram voluntarily appeared at the Midtown North Precinct, where he was arrested for assault in the second degree, a felony, and obstructing governmental administration.

104.    At some point between Mr. Ingram's arrest and arraignment, his charges were reduced to misdemeanor assault and related charges.

105.    Mr. Ingram was released without bail at his initial arraignment.

106.    Over the next 10 months, Mr. Ingram was required make multiple court appearances in connection with the charges, including on November 20, 2020 and January 11, 2021.

107.    Mr. Ingram's charges were dismissed on speedy trial grounds on May 5, 2021.

### Mr. Ingram Suffers Persistent, Debilitating Injuries as a Result of Defendants' Actions

108.     Mr. Ingram has been diagnosed with lupus, a chronic autoimmune disorder, but had been in remission for years before the August 2020 incident. Mr. Ingram experienced a lupus "flare-up" in the days following the NYPD's siege on his home, with symptoms that persist to this day.

109.    Lupus flare-ups are triggered by emotional and physical stress to the body. In Mr. Ingram's case, it resulted in symptoms including fatigue, an inability to focus, joint pain, and chronic kidney issues, among others.

110.    Mr. Ingram also developed posttraumatic stress disorder related to the incident.

111.    He has had difficulty sleeping since the day the NYPD besieged his home, and the sounds of helicopters and police sirens cause him to startle and sweat.

112.    In the months following the raid, Mr. Ingram was afraid to leave his home, and he experienced a loss of income as a result.

113.    A dent in Mr. Ingram's door from the NYPD's battering ram serves as a constant reminder of the traumatic event.

114.    On information and belief, the NYPD has shared Mr. Ingram's information with other police departments, which has facilitated additional harassment of Mr. Ingram in other cities. While at a demonstration in Ferguson, Missouri, in the aftermath of the August 7, 2020, incident, Mr. Ingram was assaulted and arrested by police officers who mentioned, "He's from New York City, we know him," on a radio run.

115.    On information and belief, the NYPD has also shared Mr. Ingram's information with the federal Transportation Security Administration, which has subjected Mr. Ingram to secondary screening at airports on several occasions since the incident.

### The Siege Draws Widespread Condemnation from Public Officials

116.     Public officials around the city denounced the NYPD's grotesque show of force against Mr. Ingram in the days and weeks following the incident.

117.    The Office of Manhattan District Attorney Cy Vance stated that it "does not condone the extraordinary tactics employed by police on Friday[,]" and added that the NYPD's actions "unjustifiably escalated conflict between law enforcement and the communities we serve."

118.     Mayor Bill de Blasio said: "This is not the right way to do things."

119.     He claimed that NYPD Commissioner Dermot Shea was unaware of the siege until after it had begun, and stated that the decision to order the operation was made at a lower level than should be permitted—"down to the level of sergeant or lieutenant"—which is "the kind of thing that needs to be addressed structurally."

120.     In an open letter to Commissioner Shea, Manhattan Borough President Gale Brewer wrote that the raid "falsely creat[ed] an impression of immediate and grave danger to the community" and that "the scale of the attempted arrest [was] completely out of proportion to the alleged offense."

121.     Brewer added that Commissioner Shea's lack of awareness of the operation "raises significant questions regarding [his] oversight of police operations, and given the scope and scale of this incident, doubt about the reliability of the department's command and control structure."

122.     Then-Mayoral candidate Maya Wiley stated: "I'm a lifetime civil rights attorney, and I have never seen anything more terrifying than what happened [to Mr. Ingram] on August 7."

### CAUSES OF ACTION

#### FIRST CLAIM
#### 42 U.S.C. § 1983 – Fourteenth Amendment – Excessive Force
#### Against Defendants Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60

123.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

124.     Defendants Smith, Cafero, and John/Jane Does #1–50 used objectively unreasonable force against Plaintiff, proximately causing injury.

125.    Defendants Townsend, Ellison, Paul, and John/Jane Does #51–60 failed to intervene to prevent the use of objectively unreasonable force against Plaintiff, despite having knowledge of and a reasonable opportunity to prevent its use.

126.    At all relevant times, Defendants Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60 were acting under color of state law.

127.    The conduct of Defendants Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does # 1–60 was willful, wanton, and reckless.

128.    As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

## SECOND CLAIM
### 42 U.S.C. § 1983 – First Amendment Retaliation
### Against Defendants Lafurno, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60

129.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

130.    Between May and August 2020, including without limitation on June 14, 2020 and July 12, 2020, Plaintiff engaged in protected First Amendment activity when he publicly protested against police brutality.

131.    Plaintiff also exercised his First Amendment rights by complaining to NYPD personnel at the 111th Precinct about the conduct of certain police officers during the July 12, 2020, protest in Bayside, Queens.

132.    Motivated by Plaintiff's exercise of his First Amendment rights, Defendants Lafurno, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does # 1–60 took adverse action against him, proximately causing injury.

133.   At all relevant times, Defendants Lafurno, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60 were acting under color of state law.

134.   The conduct of Defendants Lafurno, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does # 1–60 was willful, wanton, and reckless.

135.   As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

### THIRD CLAIM
### 42 U.S.C. § 1983 – Due Process Denial of Fair Trial – Evidence Fabrication Against Defendant Lafurno

136.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

137.   Defendant Lafurno fabricated her report that Plaintiff assaulted her by placing a megaphone over her hear and screaming at a June 14, 2020, protest.

138.   Defendant Lafurno then forwarded that fabricated report to prosecutors through correspondence with Defendants Paul and Ellison and by swearing out a deposition in support of the criminal information filed against Plaintiff on or about November 19, 2020.

139.   Such evidence was likely to influence a jury's verdict on Plaintiff's guilt or innocence.

140.   As a result of these acts, Plaintiff was deprived of his liberty.

141.   At all relevant times, Defendant Lafurno was acting under color of state law.

142.   As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

**FOURTH CLAIM**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments –**
**Unreasonable Seizure**
**Against Defendant Lafurno**

143.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

144.     Defendant Lafurno fabricated her allegation that Plaintiff assaulted her by placing a megaphone over her hear and screaming at a June 14, 2020, protest. Defendant Lafurno then swore out a deposition in support of the criminal information, accusing Plaintiff of assault on or about November 19, 2020.

145.     Defendant Lafurno's conduct caused Plaintiff to be seized without probable cause.

146.     At all relevant times, Defendant Lafurno was acting under color of state law.

147.     As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

**FIFTH CLAIM**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendments –**
**Malicious Prosecution**
**Against Defendant Lafurno**

148.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

149.     Defendant Lafurno fabricated her allegation that Plaintiff assaulted her by placing a megaphone over her hear and screaming at a June 14, 2020, protest. Defendant Lafurno then swore out a deposition in support of the criminal information, accusing Plaintiff of assault on or about November 19, 2020.

150.     By creating a false report and forwarding that information to prosecutors, Defendant Lafurno initiated a criminal proceeding against Plaintiff despite there being no probable cause for Plaintiff's prosecution.

151.     As a result of these actions, Plaintiff suffered a deprivation of liberty before the criminal charges terminated in Plaintiff's favor.

152.     Defendant Lafurno acted willfuly, knowingly, with malice and with the specific intent to deprive Plaintiff of his Constitutional rights.

153.     As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

### SIXTH CLAIM
### Common-Law Malicious Prosecution
### Against Defendants City of New York and Lafurno

154.     Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

155.     Defendant Lafurno fabricated her allegation that Plaintiff assaulted her by placing a megaphone over her ear and screaming at a June 14, 2020, protest. Defendant Lafurno then swore out a deposition in support of the criminal information, accusing Plaintiff of assault on or about November 19, 2020.

156.     By creating a false report and forwarding that information to prosecutors, Defendant Lafurno initiated a criminal proceeding against Plaintiff despite there being no probable cause for Plaintiff's prosecution.

157.     As a result of these actions, Plaintiff suffered a deprivation of liberty before the criminal charges were resolved in Plaintiff's favor.

158.     Defendant Lafurno acted willfuly, knowingly, with malice and with the specific intent to deprive Plaintiff of his Constitutional rights.

159.    At all relevant times, Defendant Lafurno was acting within the scope of her employment as an employee, agent, and/or servant of Defendant City of New York. Defendant City of New York is therefore vicariously liable to Plaintiff for Defendant Lafurno's tortious conduct under the doctrine of *respondeat superior*.

160.    As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

### SEVENTH CLAIM
### Common-Law Assault
### Against Defendants City of New York, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60

161.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

162.    On August 7, 2020, Defendants Smith, Cafero, and John/Jane Does #1–50 placed Plaintiff in imminent apprehension of harmful or offensive contact.

163.    Plaintiff did not consent to harmful or offensive contact, and such contact would not have been otherwise privileged.

164.    Defendants Townsend, Ellison, Paul, and John/Jane Does #51–60 failed to intervene to prevent Plaintiff's assault, despite having knowledge of and a reasonable opportunity to prevent its occurrence.

165.    At all relevant times, Defendants Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does # 1–60 were acting within the scope of their employment as employees, agents, and/or servants of Defendant City of New York. Defendant City of New York is therefore vicariously liable to Plaintiff for their tortious conduct under the doctrine of *respondeat superior*.

166.    As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

### EIGHTH CLAIM
### Common-Law False Imprisonment
### Against Defendants City of New York, Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does #1–60

167.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

168.    On August 7, 2020, Defendants Smith, Cafero, and John/Jane Does #1–50 confined Plaintiff, such that Plaintiff was aware of the confinement, without consent, authority, or lawful privilege.

169.    Defendants Townsend, Ellison, Paul, and John/Jane Does #51–60 failed to intervene to prevent Plaintiff's false imprisonment, despite having knowledge of and a reasonable opportunity to prevent its occurrence.

170.    Said confinement of Plaintiff proximately caused injury to Plaintiff.

171.    At all relevant times, Defendants Townsend, Ellison, Paul, Smith, Cafero, and John/Jane Does # 1–60 were acting within the scope of their employment as employees, agents, and/or servants of Defendant City of New York. Defendant City of New York is therefore vicariously liable to Plaintiff for their tortious conduct under the doctrine of *respondeat superior*.

172.    As a result of these acts, Plaintiff suffered the damages hereinbefore alleged.

## NINTH CLAIM
## Common-Law Intentional Infliction of Emotional Distress
## Against Defendants Smith, Cafero, and John/Jane Does #1–50

173.   Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

174.   On August 7, 2020, Defendants Smith, Cafero, and John/Jane Does #1–50 engaged in extreme and outrageous conduct.

175.   In engaging in such conduct, Defendants Smith, Cafero, and John/Jane Does # 1–50 intended or disregarded a substantial probability of causing Plaintiff severe emotional distress.

176.   At all relevant times, Defendants Smith, Cafero, and John/Jane Does # 1–50 were acting within the scope of their employment as employees, agents, and/or servants of Defendant City of New York. Defendant City of New York is therefore vicariously liable to Plaintiff for their tortious conduct under the doctrine of *respondeat superior*.

177.   Defendants' conduct proximately caused injury to Plaintiff, including severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A.   Compensatory damages in an amount to be determined at trial;

B.   Punitive damages against all Defendants except the City of New York in an amount to be determined at trial; and

C.  Such other and further relief as the Court may deem just and proper, together
with attorneys' fees, pre- and post-judgment interest, costs, and disbursements of
this action.

Dated:          November 3, 2021
                New York, New York


                                        KAUFMAN LIEB LEBOWITZ &
                                        FRICK LLP


                                        _____/s/_____
                                        Alanna Kaufman
                                        David Lebowitz
                                        Alyssa Isidoridy
                                        10 E. 40th Street, Suite 3307
                                        New York, New York 10016
                                        (212) 660-2332